CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY

Robert Magnanini
Kenneth S. Levine
STONE & MAGNANINI LLP
400 Connell Drive, Suite 6200
Berkeley Heights, NJ 07922
Tel:    (973) 218-1111
Fax:    (973) 218-1106
rmagnanini@smcomplex.com
klevine@smcomplex.com

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, DISTRICT OF COLUMBIA, and the policyholders of XYZ Nos. 1-10 Insurance Companies, *ex rel.* [UNDER SEAL], | Civil Action No. No. 2:17-cv-01303-SRC-CLW<br><br>**SECOND AMENDED COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**DEMAND FOR JURY TRIAL** |
|        Plaintiffs,<br><br>   v.<br><br>[UNDER SEAL],<br><br>       Defendant. | |

Robert A. Magnanini
Kenneth S. Levine
STONE & MAGNANINI LLP
400 Connell Drive, Suite 6200
Berkeley Heights, NJ 07922
Tel:    (973) 218-1111
Fax:    (973) 218-1106
rmagnanini@smcomplex.com
klevine@smcomplex.com

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, DISTRICT OF COLUMBIA, and the policyholders of XYZ Nos. 1-10 Insurance Companies, *ex rel.* STEPHEN G. ELLIOTT,<br><br>        Plaintiff,<br><br>    v.<br><br>CORCEPT THERAPEUTICS, INC.,<br><br>        Defendant. | Civil Action No. No. 2:17-cv-01303-SRC-CLW<br><br>**SECOND AMENDED COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**DEMAND FOR JURY TRIAL** |

On behalf of the United States of America, the States of California, Colorado,

Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland,

Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York,

1

North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia, and the policyholders of certain presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies), Plaintiff-Relator Stephen G. Elliott, by and through counsel, files this Second Amended *qui tam* Complaint against Defendant Corcept Therapeutics, Incorporated ("Corcept"), alleging as follows:

## INTRODUCTION

1. This is an action to recover treble damages and civil penalties on behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia ("FCA States") (together, the "Government"), from Defendant for knowingly and/or recklessly presenting or causing to be presented false claims to the Government in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), the state False Claims Acts of the FCA States, and applicable regulatory and ethical guidance.

2. This is also an action to recover treble damages and civil penalties from Defendant for knowingly and/or recklessly presenting or causing to be presented false or fraudulent health care claims to the States of California and Illinois, and to presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies) operating or insuring policyholders in those states, pursuant to the California Insurance Frauds Prevention Act ("CIPFA"), Cal. Ins. Code §§ 1871, *et seq.*, and the Illinois Claims Fraud Prevention Act ("ICFPA"), 740 I.L.C.S. §§ 92/1, *et seq.*

3. The illegal acts alleged herein began in at least 2014 and continue through the present ("Covered Period").

4. The purpose of the United States Food and Drug Administration ("FDA") is to oversee and ensure that, among other things, medications sold in the United States are safe and effective for the purposes for which they are prescribed.

5. To that end, the FDA requires that stringent clinical trials and other testing measures be undertaken before it will approve any new drug.

6. It is expressly illegal for a pharmaceutical company to market a drug for a use that was not approved by the FDA.

7. Defendant Corcept is a pharmaceutical company engaged in the development, marketing, and sale of medications that modulate the stress hormone cortisol. In 2012, the FDA approved Corcept's mifepristone compound, Korlym, for the treatment of a very narrow and particularly severe form of Cushing's Syndrome through regulation of cortisol absorption.

8. For years, Korlym was Corcept's only FDA-approved medication. Corcept's own past financial statements for years stated that the company's continued viability was "solely dependent on the successful commercialization of Korlym," including significant dependence on "adequate and timely reimbursement" from various Government-funded healthcare programs at the federal and state level, such as Medicaid and Medicare ("Government Programs"). (*See, e.g.,* November 1, 2016 10-Q). In June 2024, Corcept made available an authorized generic version of Korlym for the same indication.

9. In Corcept's annual 10-K filing in February 2025, Corcept continued to describe how financially dependent the company is on the drug:

> Many factors could limit our product revenue, including:

3

- the preference of physicians or payors for competing treatments for hypercortisolism, including a lower-priced generic version of Korlym and off-label treatments; and
- lack of availability of government or private insurance, the shift of a significant number of patients to Medicaid, which reimburses Korlym at a significantly lower price, or the introduction of government price controls or other price-reducing regulations, such as the Inflation Reduction Act of 2022, that may significantly limit Medicare reimbursement rates.

Corcept Form 10-K, year ended December 31, 2024.[1]

10.    Despite the single, extremely narrow FDA approval that Corcept obtained for Korlym, Corcept sought to illegally expand the Korlym market through engaging in the systematic promotion and sale of Korlym for "off-label" uses—*i.e.*, unapproved uses for which no clinical trials have been conducted and which pose grave health risks to patients.

11.    Specifically, Corcept engaged in the off-label marketing of Korlym for at least the following unapproved uses: diabetes, metabolic syndrome, obesity, adrenal adjunctive therapy (also known as "bridge therapy"), and HPA Axis disorders.

12.    As a result of Corcept's improper off-label marketing, numerous false claims were submitted to Government Programs and private insurers for Korlym by Dohmen. Corcept's schemes caused Government Programs and private insurers to pay reimbursements for Korlym that would not have been made but for its illegal marketing, and which are specifically prohibited by federal law and regulation. As a result, the United States and the FCA States have issued at least $25,000,000 (and an as-yet unknown amount issued by private insurers) in unauthorized payments to Defendant during the Covered Period.

---

[1] https://ir.corcept.com/static-files/5d36f16e-8b8f-4c76-afd0-6d6539f5ac0d

13.    Indeed, as of August 2016, Relator has knowledge that as much as fifty percent (50%) of the revenues related to sales of Korlym were obtained through illegal off-label promotion.

14.    Further, Corcept's own disclosures to the U.S. Securities and Exchange Commission show that Corcept's revenues grew from $3,307,000 in 2012 to $401,858,000 in 2022, an astounding 12,051.74% increase in sales of a drug with a very limited population of patients.

15.    Defendant has actual knowledge that it was and is engaging in illegal misconduct, including knowledge that the reimbursements sought for off-label Korlym prescriptions written as a result of illegal marketing schemes are not entitled to payment and that improperly obtained payments must be refunded to the Government.  Defendant chose to profit from fraudulently billing Government Programs instead of disclosing the true nature and extent of its products or returning improperly obtained public funds.

16.    Relator believes that Defendant has caused a total actual loss to the United States and the FCA States in excess of $25,000,000 (and an as yet unknown amount issued by private insurers) during the Covered Period.

**PARTIES**

17.    Plaintiff Relator is an individual and citizen of the United States of America and the State of Ohio, currently residing in Mason, Ohio.  He is a pharmaceutical sales representative who worked for Defendant from September 2012 to August 2016, having sold the second ever prescription for Korlym.  In that capacity, Relator gained direct and independent knowledge of the information on which the below allegations are based, and herein voluntarily discloses such information to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i).  To the extent any of his allegations have been publicly disclosed as contemplated by 31 U.S.C. § 3730(e)(4)(A),

5

Relator's knowledge is independent of and materially adds to those allegations as pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii).

18.    Relator seeks to recover for the benefit of the United States. The United States administers healthcare programs for qualifying beneficiaries through its agencies, including: the U.S. Department of Health and Human Services and its component, CMS, administer the Medicare program; the U.S. Department of Defense administers the TRICARE program; the Office of Personnel Management ("OPM") administers the Federal Employees Health Benefits Program ("FEHBP"); and the U.S. Department of Labor's Division of Federal Employees', Longshore and Harbor Workers' Compensation ("DFELHWC") administered the Federal Employees' Compensation Act ("FECA") program until November 22, 2024, when it was realigned into two separate agencies, the Division of Federal Employees Compensation ("DFEC") and the Division of Longshore and Harbor Workers' Compensation ("DLHWC"). Collectively, the Medicare, TRICARE, FEHBP, and FECA programs are referred to herein as the "Federal Healthcare Programs." Relator seeks to recover for the benefit of the United States and the FCA States all appropriate damages, civil penalties, interest, costs, and fees arising from Defendant's violations of the FCA and State False Claims Acts.

19.    Defendant Corcept Therapeutics, Incorporated, is a Delaware corporation with its headquarters in Menlo Park, California. Corcept transacts business across the United States, including in New Jersey, Ohio and in each of the FCA States, by developing, manufacturing, promoting, selling, and distributing prescription drugs.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over Relator's claims. The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. § 3732, and otherwise have jurisdiction over federal statutory causes of action under

28 U.S.C. §§ 1331 and 1345. This Court has jurisdiction over Relator's state statutory and common law claims pursuant to 28 U.S.C. § 1367.

21. At all relevant times, Defendant conducted regular, substantial business in the United States, including the State of New Jersey. Accordingly, Defendant is properly subject to personal jurisdiction in the State of New Jersey generally and this Court specifically.

22. Venue is appropriate in the District of New Jersey pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(1) and (2). Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred." The acts complained of herein occurred, among other places, throughout the State of New Jersey and within the geographic area encompassed by the United States District Court for the District of New Jersey.

23. Under both the FCA and the State FCAs discussed herein, this Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

### STATUTORY SCHEME

#### Government-Funded Health Programs

24. The Medicare Program is a federal government-funded medical assistance program, primarily benefiting the elderly, which was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter, "Medicare"). Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by taxpayer revenue. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment to persons older than 65 years of age and others who qualify under its terms. Pursuant to the

7

Medicare Prescription Drug Improvement and Modernization Act of 2003, Medicare Part D extended prescription drug coverage to all Medicare-eligible persons who elect to participate.

25.     Significantly, Medicare reimbursement is prohibited if the item or service is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

26.     The Medicaid Program was also created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the financially needy, aged, blind, or disabled, and families with dependent children. *See* 42 U.S.C. §§ 1396-96w.   Medicaid is funded by both federal and state governments (collectively, "Medicaid Funds"), with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b, 1396d(b).   Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals who qualify under its terms.   At the federal level, Medicaid is administered by CMS.  At the state level, each of the 50 participating states has a state agency to administer the program.

27.     Each state is permitted to design its own medical assistance plan, subject to CMS parameters and HHS approval.   Among other forms of medical assistance, the states are permitted to provide medical assistance from the Medicaid Funds to eligible persons for inpatient and outpatient prescription drugs.  42 U.S.C. §§ 1396a(10)(A), 1396d(a)(12).

28.     The federal statute defers to each state's definition of "medical necessity" for purposes of Medicaid.   For example, in New Jersey, "medical necessity" is clearly a prerequisite for provision of Medicaid services, but is a determination left to the physician's discretion: "Any service limitations imposed will be consistent with the medical necessity of the patient's condition as determined by the attending physician or other practitioner and in

8

accordance with standards generally recognized by health professionals and promulgated through the New Jersey Medicaid program." N.J.A.C. § 10:49-5.1 (2016).

## The Federal False Claims Act

29. The federal FCA imposes liability upon any person who: "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved." 31 U.S.C. § 3729(a)(1) & (2). Any person found to have violated these provisions is liable for a civil penalty of at least $14,308 and up to $28,619 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government. *Id.*; 28 C.F.R. 85.5 (setting civil penalties).

30. Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

31. The FCA broadly defines a "claim" as one that "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

32. False or fraudulent bills or other requests for payment or reimbursement from Government Programs have routinely been found to constitute "claims" giving rise to liability under the FCA. *See, e.g., Universal Health Servs. v. United States ex rel. Escobar,* 136 S. Ct. 1989, 2001 (2016).

33.     The Supreme Court has stated that Congress intended that the FCA be broadly applied to protect government funds and property from fraudulent claims. *See, e.g., United States v. Niefert-White Company,* 390 U.S. 228 (1968).

34.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The FCA contains anti-retaliation provisions which prohibit an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations." 31 U.S.C. § 3730(h)(1). The relief available to an employee under this provision is two times the amount of back pay plus interest, reinstatement with the same seniority status, and compensation for any special damages, including litigation costs. 31 U.S.C. § 3730(h)(2).

## The State False Claims Acts

35.     This is also an action to recover double and treble damages and civil penalties on behalf of the named States arising from the conduct of Defendant who:  (a) made, used or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the States; and/or (b) made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the States, all in violation of each States' respective false claims act or similar statute. The false or fraudulent claims, statements, and records at issue involve payments made by health insurance programs funded by these State governments, including Medicaid. The statutes of the States under which Relator brings these related claims are the:

    a.  California False Claims Act, Cal. Govt. Code §§ 12651, *et seq.*;

    b.  Colorado False Claims Act, Colo. Stat. Ann. §§ 24-31-1201, *et seq.*;

10

c.  Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274, *et seq.*;

d.  Delaware False Claims and Reporting Act, Del Code Ann. tit. 6, §§ 1201, *et seq.*;

e.  Florida False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.*;

f.  Georgia False Medicaid Claims Act, Ga. Code. Ann. §§ 49-4-168.1, *et seq.*;

g.  Hawaii False Claims to the State Act, Haw. Rev. Stat. §§ 661-21, *et seq.*;

h.  Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1, *et seq.*;

i.  Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7, *et seq.*;

j.  Iowa False Claims Act, Iowa Code §§ 685.1, *et seq.*;

k.  Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:439.1, *et seq.*;

l.  Maryland False Health Claims Act, Md. Code, Health-Gen. §§ 2-601 *et seq.*;

m.  Massachusetts False Claims Law, Mass. Gen. Laws ch. 12, §§ 5A, *et seq.*;

n.  Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601, et seq.;

o.  Minnesota False Claims Against the State Act, Minn. Stat. §§ 15C.01, *et seq.*;

p.  Montana False Claims Act, Mont. Code Ann. §§ 17-8-401, *et seq.*;

q.  Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010, *et seq.*;

r.  New Jersey False Claims Act, N.J.S.A. §§ 2A:32C-1, *et seq.*;

s.  New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*;

t.  New York False Claims Act, N.Y. State Fin. Law §§ 187, *et seq.*;

u.  North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605, *et seq.*;

v.  Oklahoma Medicaid False Claims Act, 63 Okla. St. Ann. §§ 5053, *et seq.*;

w.  The State False Claims Act (Rhode Island), R.I. Gen. Laws §§ 9-1.1-1, *et seq.*;

11

x.  Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*;

y.  Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*;

z.  Vermont False Claims Act, 32 V.S.A. §§ 630, *et seq.*;

aa. Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq.*;

bb. Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. §§ 74.66.005, *et seq.*; and the

cc. District of Columbia False Claims Act, D.C. Code Ann. §§ 2-308.03, *et seq.*

### Kickback Regulations and Compliance Guides

36.  American Medical Association ("AMA") policy states that "[t]o avoid the acceptance of inappropriate gifts, physicians . . . should not accept gifts if they are given in relation to the physician's prescribing practices. In addition, when companies underwrite medical conferences or lectures other than their own, responsibility for and control over the selection of content, faculty, educational methods, and materials should belong to the organizers of the conferences or lectures." AMA Council on Ethical and Judicial Affairs, "Gifts to Physicians from Industry," AMA Ethical Opinion 8.061.

37.  AMA policy also prohibits physicians from accepting "any kind of payment or compensation from a drug company . . . for prescribing its products." *See* AMA Ethical Opinion 6.04 (Fee Splitting); *see also* AMA Ethical Opinion 6.02 (Fee Splitting).

38.  The American College of Physicians' Ethics Manual ("Ethics Manual") recognizes "drug industry gifts" as having potentially negative influence on clinical judgment and notes that it is "unethical for a physician to receive a commission or a kickback from anyone, including a company that manufactures or sells medical products or medications." *See* Ethics

12

Manual, Financial Conflicts of Interest, Seventh Addition.[2] Free or discounted equipment or services to physicians are "suspect" under the CMPL, 42 U.S.C. § 1320a; Office of Inspector General Guidance, COMPLIANCE PROGRAM GUIDANCE FOR PHARMACEUTICAL MANUFACTURERS, 68 Fed. Reg. 86 at 23731 (hereinafter, "OIG Guidance.").[3]

39.    Research contracts that originate through the sales and marketing functions—or that are offered to doctors in connection with sales contacts—are particularly suspect under the Anti-Kickback Statute. *See* OIG Guidance, 68 Fed. Reg. at 23738. Most dubious in this regard is research that is initiated or directed by the sales or marketing agents that is not transmitted to the manufacturer's science division. *Id.*

### The California and Illinois Insurance Fraud Prevention Acts

40.    While the federal and state FCA statutes protect *public* insurance entities from fraud, California and Illinois are unique in permitting whistleblowers to bring a *qui tam* action against any person or company that defrauds *private* insurance companies and share in the recovery. *See* California Insurance Frauds Prevention Act ("CIPFA"), Cal. Ins. Code §§ 1871, *et seq.*; Illinois Claims Fraud Prevention Act ("ICFPA"), 740 I.L.C.S §§ 92/1, *et seq.*

41.    Rather than bringing the case on behalf of the government and fellow taxpayers, the CIPFA or ICFPA relator brings the case on behalf of the government and the relevant private insurance companies' policyholders.

---

[2] https://www.acpjournals.org/doi/10.7326/M18-2160?_ga=2.66579438.1964690088.1713187912-1243635620.1704211871&_gac=1.162212558.1711458150.CjwKCAjwkuqvBhAQEiwA65XxQJNFhxs9-5XTFmkJRkgW3f8GQmz_5TZbx-6lVPXoxfP9EkwUWbRinhoC79MQAvD_BwE#sec-5-3

[3] https://www.federalregister.gov/documents/2003/05/05/03-10949/oig-compliance-program-guidance-for-pharmaceutical-manufacturers

## RELEVANT FACTS
### Background

42.    The events detailed below took place across the United States, as a result of Defendant Corcept's nationwide scheme.

43.    As noted above, the purpose of the FDA is to oversee and ensure that, among other things, medications sold in the United States are safe and effective for the purposes for which they are prescribed.

44.    To that end, the FDA requires that stringent clinical trials and other testing measures be undertaken before it will approve any new drug.

45.    In 1980, French drug company Roussel-Uclaf first synthesized a mifepristone compound, which it called RU-38486, later shortened to RU-486, in developing drugs for mood disorders.  Tests during the 1980's showed mifepristone was effective for medical abortion when taken in combination with another drug called misoprostol, and France approved RU-486 for this use in September 1988.  Twelve years later, RU-486 was approved by the FDA for the termination of pregnancy in the United States, in September 2000.

46.    As an abortion pill, mifepristone is taken as a single 200mg dose, followed by a 800mg dose of misoprostol one to two days later.  No further mifepristone is prescribed or taken.

47.    Corcept has been developing pharmaceuticals since 1998.  In the early 2000s, Corcept began undertaking clinical trials studying the use of mifepristone as a cortisol receptor blocker to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.

48.    Cushing's Syndrome is a medical condition characterized by tumors on the adrenal or pituitary gland, but in some cases the tumor could be located in another unknown

14

region of the body. Some of the common signs and symptoms of Cushing's Syndrome include weight gain and fatty tissue deposits, stretch marks, thinning and fragile skin that bruises easily, acne, decreased libido and fertility, thicker or more visible body hair, erectile dysfunction, severe fatigue, muscle weakness, depression and anxiety, cognitive difficulties, loss of emotional control, high blood pressure, headache, type 2 diabetes, and bone loss.[4]

## Korlym

49.    In 2011, Corcept completed clinical trials of a mifepristone compound (now called Korlym) for treating the secondary, metabolic symptoms of Cushing's Syndrome and applied for orphan drug status with the FDA. (*See* Corcept 6/30/11 Press Release).

50.    Despite its limited approved use, in April 2012 the FDA granted Corcept's orphan drug application.

51.    Recognizing the dangers of Korlym and the limited uses for which it had been demonstrated, however, the FDA approved Korlym for prescription only in the following, extremely limited circumstances:  (1) to control hyperglycemia (2) which is secondary to hypercortisolism (3) in adult patients with endogenous Cushing's Syndrome (4) who have type 2 diabetes mellitus or glucose intolerance **and** (5) have had failed surgery or are not candidates for surgery.[5]  Failure to meet any one of these five criteria renders a patient ineligible to take Korlym under federal law and regulation.

52.    Because Korlym is a powerful biologic with extremely dangerous side effects – indeed, it has even been tested as a drug to be used in combination with chemotherapy for certain

---

[4] https://www.mayoclinic.org/diseases-conditions/cushing-syndrome/symptoms-causes/syc-20351310

[5] https://www.korlym.com/pdfs/KorlymPrescribingInformation.pdf, last accessed Feb. 13, 2026 (Korlym package insert: "INDICATIONS AND USAGE KORLYM (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.").

types of cancer – it was extremely important to ensure its use was not expanded beyond the very limited use approved on its label.

53.    Under Medicare, Korlym is a Tier 5 medication, making it a non-preferred brand-name drug.  It is the most expensive CMS Tier, with the highest level of reimbursement. (CMS data).

54.    A single pill of Korlym costs over $700, and a 28-day pack is nearly $20,000.[6] The average copay, for both private and Government Program patients, is $4000, while the gap coverage reimbursement under Medicare is $6100.

55.    According to CMS data, Medicare alone spent the following amounts on Korlym for 2012 through 2015:  (1) 2012: $609,086 for 32 claims; (2) 2013: $2,580,203 for 188 claims; (3) 2014: $6,231,613 for 402 claims; and (4) 2015: $11,444,014 for 651 claims.  Medicaid spent nearly $10,000,000 during the same period.  (CMS data).

56.    According to more recent CMS Part D data,[7] Medicare spending on Korlym continues to expand:

- In 2019, total Medicare spending was $132,392,600 for 4,915 total claims, with an average spend per dosage unit of $488.32, and an average spend per claim of $26,936;

- In 2020, total Medicare spending was $153,690,298 for 5,261 total claims, with an average spend per dosage unit of $532.93, and an average spend per claim of $29,213;

- In 2021, total Medicare spending was $165,795,595 for 5,625 total claims, with an average spend per dosage unit of $553.82, and an average spend per claim of $26,474;

---

[6] https://www.drugs.com/compare/korlym
[7] https://data.cms.gov/summary-statistics-on-use-and-payments/medicare-medicaid-spending-by-drug/medicare-part-d-spending-by-drug/data

16

- In 2022, total Medicare spending was $187,312,598 for 6,080 total claims, with an average spend per dosage unit of $579.93, and an average spend per claim of $30,807; and

- In 2023, total Medicare spending was $228,814,733 for 6,959 total claims, with an average spend per dosage unit of $632.17, and an average spend per claim of $32,894.

57.    On about July 1, 2013, Corcept contracted with Dohmen for exclusive cash management, order fulfillment, logistics and distribution support, invoicing and cash collections, inventory management, and data reporting services regarding Korlym. (SEC Ex. 10.41). On August 4, 2017, Corcept entered into a distribution services agreement with Optime Care, Inc. to provide specialty pharmacy services to Corcept.[8] On October 1, 2024, Corcept engaged Curant Rare as a new distributor for Korlym.[9]

58.    Corcept also promotes the sale of Korlym through its Support Program for Access and Reimbursement for Korlym ("SPARK").[10] SPARK ostensibly serves as the single point of contact for prescribers, patients, and specialty pharmacies, coordinating the many activities that are required to get Korlym to patients. In order for a patient to receive Korlym in any setting or from any provider, the patient must be "enrolled" in SPARK.

59.    Corcept's SPARK reimbursement "coordinators" contact a patient's insurance company to verify coverage and reimbursement benefits and, if needed, research alternate coverage options.[11] SPARK also reviews patients' eligibility for coverage options such as a copay assistance program, a patient assistance program for qualifying uninsured patients, and

---

[8] https://www.sec.gov/Archives/edgar/data/1088856/000156459017016066/cort-8k_20170804.htm

[9] https://www.ainvest.com/news/corcept-therapeutics-adjusts-korlym-distribution-strategy-implications-short-term-sales-projections-2510/

[10] https://www.korlym.com/hcp/access-support/corcept-cares

[11] https://www.korlym.com/patient-support/getting-your-medicine

referrals to other organizations that may provide alternate funding, such as the National Organization for Rare Disorders ("NORD").[12]

60.    SPARK therefore serves as the interface between Corcept employees, Dohmen or its successors, NORD employees, physicians, patients, and insurance companies.    Through SPARK, Corcept is able to effectuate its scheme to promote off-label uses to physicians, obtain off-label prescriptions for patients, and dupe both public and private insurers into paying for the illicit prescriptions.

<strong><u>Relator's Experience</u></strong>

61.    Relator has been developing business for pharmaceutical companies since 1997. Over his highly successful career, Relator had worked at some of the country's largest pharmaceutical companies in marketing their drugs, including GSK and Bristol Myers Squibb.

62.    Relator joined Corcept in August 2012, just weeks after Korlym's FDA approval, as part of the initial sales team.    Relator sold the second ever Korlym prescription.    From the start, and given his decades of industry experience, Relator played a central role in marketing Korlym for Corcept.

63.    While at Corcept, Relator was consistently ranked the number one or two salesperson nationwide.    Relator was ranked number one in 2012 and 2014, and number two in 2013, 2015, and 2016 (prior to his termination in August 2016).    Relator was responsible for the Central Region, comprising upstate New York, Pennsylvania, Ohio, Tennessee, Kentucky, and West Virginia.    Relator worked throughout these states, and traveled to California several times per year for additional training.

---

[12]
https://www.sec.gov/Archives/edgar/data/1088856/000110262412000397/corcepttherapeutics.htm

64.     Given his experience and success at Corcept, Relator was asked in 2012 to help Corcept interview and train new salespeople.  Relator and the other field trainers consistently made clear in their trainings that off-label marketing—marketing Korlym for anything other than its one approved use—was not allowed or tolerated at Corcept.

### Off-Label Marketing Scheme

65.     Under controlling law and regulation, physicians can prescribe drugs off-label, or outside of the intended use according to their label as approved by the FDA.  Drug makers, however, cannot advertise or promote use of their products off-label.  These laws and regulations exist to protect patients from use of therapies in indications for which there is insufficient evidence to support their safety and efficacy.

66.     Korlym was approved for only one use–to mitigate the secondary, metabolic symptoms associated with Cushing's Syndrome.  All other uses were unapproved, "off-label" uses that were available to physicians but could not be promoted by Corcept or Dohmen or its successors.

67.     Moreover, Relator reviewed several medically-accepted compendia and found that no off-label uses for Korlym had been approved by Medicare or Medicaid.  Government reimbursement for drugs and biologicals may be available even when such products are used for indications not listed on the FDA-approved label. Specifically, Medicare's definition of "drugs and biologicals" includes any such off-label uses when it is for a "medically-accepted indication" that is supported by citations in certain compendia.  There were and are five approved authoritative sources for use in the determination of a "medically-accepted indication" of drugs and biologicals used off-label under Medicare: Wolters Kluwer Lexi-Drugs®, American Hospital Formulary Service-Drug Information (AHFS-DI), Truven Health Analytics Micromedex DrugDEX (DrugDEX), National Comprehensive Cancer Network (NCCN) Drugs

19

and Biologics Compendium, and Elsevier/Gold Standard Clinical Pharmacology. Relator had searched those indexes and found no approved off-label use for Korlym.[13]

68.    Relator had nonetheless observed and experienced countless occasions on which Defendant promoted the use of Korlym for several other unapproved indications: diabetes, metabolic syndrome, obesity, adrenal adjunctive therapy (also known as "bridge therapy"), and HPA Axis disorders.

69.    For example, bridge therapy is used where a patient has a tumor on one adrenal gland that is causing abnormal elevated cortisol. Corcept had been promoting Korlym not to block elevated cortisol but to help reset the HPA axis prior to adrenalectomy surgery so that the patient would have reduced or no post-surgery dependence on the standard of care steroid therapy. This was an off-label use that had not been properly medically or scientifically vetted.

70.    By 2013, Relator had heard rumors of off-label marketing in other regions and discussed them, over the course of several conversations in 2013 and 2014, with his Central Region team and supervisor. All involved—including the Central Region Director of Sales Bart Caruth—agreed that any off-label marketing of Korlym should and would be immediately quashed as entirely impermissible. When Caruth was replaced by Gary Owens, Relator raised with him, at the 2015 National Sales Meeting, the Central Region team's concerns about off-label marketing on the team's behalf. Owens similarly made clear that off-label marketing was unacceptable, and agreed to raise the team's concerns with upper management.

71.    In 2015, Corcept hired a new Northeast Regional Director of Sales, Tom Burke, who came from Salix Pharmaceuticals, Incorporated ("Salix"). Burke in turn brought a number of his Salix colleagues to Corcept's marketing/sales departments, including the Vice President of

---

[13] https://thecapitolforum.com/corcept-doj-investigation-may-involve-off-label-marketing-of-flagship-drug-source-says-potential-promotion-for-off-label-use-continues/

20

Marketing, Director and Associate Director of Field Training, and multiple Regional Directors of Sales. By 2016, Burke was promoted to National Director of Sales.

72. Shortly before these transfers, Salix and its marketing team had been accused of far-reaching Government Program fraud—involving similar allegations of illegally marketing pharmaceutical products—and ultimately reached a settlement with the Government in the amount of $54 million. Specifically, Salix was accused of using sham "speaker programs" to ostensibly "educate" doctors on their drug products from 2009 through 2013, while in fact just buying the physicians fancy dinners at high-end restaurants. (*See* SDNY USAO Settlement Press Release 6/9/16). The Salix team joined Corcept while the case was still under investigation by federal prosecutors.

73. Corcept's decision to hire these salespeople signaled its clear intent to push the legal limits of marketing its core drug, Korlym.

74. Once Burke and his Salix crew arrived, the marketing of Korlym changed drastically. In fact, it became almost immediately evident that the entire sales culture of Corcept would change. A broad strategy to engage in off-label promotion of Korlym was immediately commenced. As detailed extensively below, Corcept's nationwide trainings and promotional materials began incorporating off-label uses, including regular emails from the National Director of Sales and Director of Training to all Corcept salespeople with "educational materials" on diabetes, obesity, metabolic syndrome, and HPA Axis disorders (none of which are approved uses for Korlym) to distribute to doctors, and a presentation by then-salesperson Carl Balzanti at Corcept's annual national convention in Las Vegas advising Corcept salespeople on marketing off-label uses and demonstrating how to amend enrollment forms to pass muster with insurers. Balzanti was later promoted to West Coast Region Director of Sales.

21

75.    Relator has first-hand knowledge of Corcept's highest level employees engaging in off-label promotion, including the Director of Reimbursement Specialists Jennifer Lundberg and Associate Director of Medical Affairs Dr. Andreas Moritis both amending and approving amended enrollment forms.

76.    Relator has had first-hand conversations with doctors in which the doctors advised that they learned of a particular off-label use for Korlym through Corcept's marketing materials or "advisory board" meetings, attempted such use, and had patients suffer extreme harm and even death as a result.

77.    Relator has first-hand knowledge that National Director of Sales Tom Burke, Associate National Director of Sales Mike Evans, and Senior Vice President of Sales Sean Maduck are actively training and requiring that Clinical Specialists (Corcept's term for its sales representatives) engage in this off-label promotion of Korlym for bridge therapy and other uses.

78.    Further training on these aforementioned off-label uses for Korlym has occurred at Corcept meetings and is also accomplished through one-on-one sessions with management and other sales training related activities.

79.    The off-label uses of Korlym are further promoted through speaker training programs (where physicians are compensated to attend meetings where they are given extensive training on Korlym's on- and off-label uses for the purpose of acting as speakers and advocates on behalf of Corcept) and through advisory boards.

80.    This off-label promotion is also coordinated with Corcept's Medical Science Liaisons ("MSLs").    Generally, MSLs have advanced scientific training and academic credentials consisting of a doctorate degree (Ph.D., PharmD., M.D.) in the life sciences.    When used properly, they work throughout a product's lifecycle, helping to ensure that products are

22

utilized effectively, serving as scientific peers and resources within the medical community, and are scientific experts to internal colleagues at companies. However, the primary purpose of an MSL is to establish and maintain peer-peer relationships with leading physicians, at major academic institutions and clinics.[14]

81.    Instead, Corcept has perverted the role of its MSLs to glorified salespersons and off-label advocates.  The Corcept MSLs attend most lunches with the Clinical Specialists and participate in sales presentations. MSLs are also expected to actively handle reimbursement issues which may arise.

82.    In addition to the bridge therapy discussed above, Dan O'Brien and several other Clinical Specialists at Corcept were also promoting Korlym off-label to treat obesity, with the consent and approval of the National Director of Field Training.  Korlym was not indicated nor had it been studied for obesity at that time.  Yet the Director of Field Training sent emails with "educational materials" on cortisol and obesity to all Corcept Clinical Specialists nationwide, without qualification.

83.    In addition to disseminating similar materials on diabetes, the National Director of Sales Tom Burke had emailed Corcept Clinical Specialists region-wide lists of doctors who were the top prescribers of insulin, suggesting that the salespeople target these diabetes doctors and educate them on the use of Korlym.  Not only was Korlym not indicated for diabetes, it was contraindicated at that time.  Specifically, the FDA had mandated an "Important Limitations of Use" warning for Korlym which expressly stated: "Do not use for the treatment of type 2 diabetes mellitus unrelated to endogenous Cushing's syndrome."

84.    Corcept also took action to systematically deceive both public and private insurers regarding the off-label use of Korlym.

---

[14] https://themsls.org/what-is-an-msl/

85.     Specifically, when a physician submits a SPARK enrollment form with an off-label diagnosis code, it was sent to Dr. Andreas Moritis, Associate Director of Medical Affairs, for review. Dr. Moritis then changed the code to one that the patient's insurer would approve so that insurance would pay for Korlym despite the unapproved use.

86.     Jennifer Lundberg, the Director of Reimbursement Specialists, coordinated the code alterations with Dr. Moritis, with the express knowledge and approval of National Director of Sales Tom Burke and Senior Vice President of Sales Sean Maduck.

87.     The MSLs and Clinical Specialists were instructed by Corcept to be assertive in making sure that doctors offices did not use the off-label coding for the off-label use of Korlym.

88.     In fact, at Corcept's 2015 National Meeting in Las Vegas, Nevada, Clinical Specialist (later West Coast Region Director of Sales) Carl Balzanti put on a workshop in front of the entire Corcept sales team regarding off-label uses of Korlym and how he would fill out SPARK enrollment forms, benefits investigations, look through patient files and fax forms to insurers.

89.     Relator complained to Corcept management that Mr. Balzanti's presentation was improper and discussed activities that were highly illegal. Relator was told to "be quiet." After his presentation, Carl Balzanti was later promoted to West Coast Region Director of Sales—a position in which Mr. Balzanti remained until his departure from Corcept in late 2017/early 2018.

90.     In fact, between 2013 and 2016, Relator complained about the illicit off-label marketing of Korlym to at least two Regional Directors of Sales (Bart Caruth and Gary Owens), the National Director of Sales Tom Burke, Associate National Director of Sales Mike Evans, Senior Vice President of Sales Sean Maduck, National Director of Training Melissa Ansari,

24

Associate Director of Field Training Mike LaFave, and, remarkably, Corcept's Chief Executive Officer, Joe Belanoff.

91.    Corcept failed to take any corrective action based on Relator's complaints, and, in fact, retaliated against Relator.

92.    Corcept also had defrauded insurance plans due to the systemic off-label promotion and alteration of diagnosis codes by Corcept.

## RETALIATION

93.    From 2012, when he started working at Corcept, through to at least 2015, Relator had been widely praised for his work at Corcept, and rewarded with bonuses and accolades.

94.    For example, as one of the top clinical specialists at Corcept, Relator won numerous Corcept sales awards including the President's Club, Clinical Specialist of the Year, Sales Excellence Award, Core Values Award, and New Prescriber Award.



95.    But beginning in 2015, as Relator began voicing increasing concerns and objections about Corcept's off-label marketing practices and the risk to health and safety it

created, Relator's standing at Corcept changed, leading to Corcept to ultimately terminate him in August 2016.

96.     In about late 2014, Bart Caruth, Corcept's Central Region Director of Sales, left the company and encouraged Relator to apply for the position. Relator submitted for the position and on or about March 13, 2015, sat for an interview for the position.

97.     During an all-day session, Relator interviewed separately with Corcept's then-Chairman of the Board Jim Wilson, with Director of Human Resources Kit Bay, with Senior Vice President of Sales and Marketing Sean Maduck, with Associate Director of Commercial Training and Development Melissa Ansari, with Director of Commercial Operations John Lyons, and with Vice President of Commercial Operations David Penake.

98.     Relator discussed at these interviews that off-label marketing was a problem at Corcept that needed to be corrected, emphasized in these interviews the importance of ethics, including putting a stop to any off label marketing.

99.     Relator did not receive this promotion.

100.    Next, starting in about January 2016, Relator was given extra responsibilities and the title of "Acting Region Manager" when the prior Region Manager, Gary Owens, left the company.

101.    In about that same month, Relator sat for a second attempt at a promotion. This resulted in a two-part interview that occurred in approximately January 2016. The first interview was with Corcept's Chief Executive Officer, Joe Belanoff. Following this interview, Belanoff told Relator that he had his "full support." The second interview was again with Senior Vice President of Sales Sean Maduck, at which Relator emphasized again the need for ethics and to stop off-label marketing. Relator did not receive this promotion either.

102.    Relator therefore made clear in both the 2015 and 2016 interviews that he did not and would not support Corcept's off-label marketing strategy. And in both instances, Relator did not get the promotion for which he was long overdue.

103.    Undeterred, Relator continued to raise his off-label marketing concerns with, among others as described above, National Director of Sales Tom Burke in January, February, March, and April 2016. These complaints were made verbally and happened on at least four separate occasions during this time span. Relator made clear that Corcept was putting its patients at serious risk and that urging physicians to prescribe Korlym for off-label uses, for which there was little or no evidence of effectiveness or safety, was plainly against the law.

104.    Despite Relator's repeated complaints about the widespread off-label marketing of Korlym, rather than take action to stop the illegal and improper off-label promotion of Korlym, Mr. Burke told Relator that Relator needed to conduct himself more like Tyler Franklin—a Clinical Specialist who had engaged in prolific levels of bridge therapy related off-label promotion of Korlym. This demand was made despite Relator's exceptional—and legal—sales performance and strategy.

105.    Thus, Corcept's senior management, instead of dealing with these issues, told Relator to "shut up" and focus on promoting the profitable, off-label uses for Korlym.

106.    A turning point for Relator occurred in about February 2016, when Relator spoke to Dr. Bradley S. Eilerman, a physician Relator had met with numerous times in marketing Korlym. Dr. Eilerman told Relator that he had prescribed Korlym to a patient for bridge therapy use, an off-label prescription, and the patient nearly died. Relator wrote up and reported the incident as an Adverse Event. Relator also discussed with Dr. Eilerman the dangers of off-label prescriptions of Korlym.

27

107.    The incident involving Dr. Eilerman's patient greatly impacted Relator, and led Relator to increase his efforts to stop off-label marketing of Korlym.

108.    At first, Relator continued to raise the concerns internally at Corcept at meetings where possible. Relator was instructed by his direct supervisor, Mark LaFave, and Mr. Burke to "shut up" and stop complaining about the fact that Dr. Eilerman's patient nearly died from this off-label, bridge therapy use of Korlym. These statements were made by Mr. LaFave and Mr. Burke on or about April 2016.

109.    Not seeing sufficient progress, beginning in about May 2016, without alerting his supervisors, Relator contacted the FDA on his own and submitted written information to the FDA about Corcept's off-label marketing.

110.    Beginning in about June 2016, Relator began more active communications with the FDA. Relator was put into direct contact with a FDA Special Agent in about June or July of 2016.

111.    When Relator communicated with the FDA about Corcept, he believed at the time that Corcept did not know about his communications. But soon after Relator began actively communicating with the FDA about the off-label marketing, Relator detected a distinct change in attitude by his supervisors to him. Relator suspected that Corcept discovered or guessed that Relator was communicating with the FDA about off-label marketing of Korlym, perhaps by checking his work emails or examining what documents he had been reviewing, printing, or downloading at work.

112.    Corcept's retaliation to Relator for repeatedly raising concerns about off-label marketing, and possibly for contacting the FDA about the illegal activity, next manifested in Relator's attempt to gain a promotion.

28

113.    In about July 2016, Relator interviewed for the Region Manager position for which he was currently serving in the "acting" role.  At the interview, Relator said he intended to hold the people in his region to practice at the highest of ethical standards, including cessation of any off-label marketing.  Corcept did not give Relator the promotion to Region Manager.

114.    Finally, in August 2016, Corcept terminated Relator based on an entirely pretextual basis.  Tom Burke, who was the new National Director of Sales, claimed that on an internal call, Relator had used an inappropriate expression that constituted sexual harassment.  The phrase Relator used on the call was to "get on his knees and beg" for a company to take a certain action—a common phrase used in business contexts that does not have a sexual context in the normal use of the phrase.  Corcept, through Tom Burke, used this as an excuse to first give Relator a warning and undergo an alleged investigation, and then to terminate Relator later that month.

115.    The claim that the termination was based on Relator's comments was entirely pretextual.  Relatior had not used an inappropriate phrase.  Corcept terminated Relator because Relator was raising complaints about Corcept's off-label marketing, and potentially because Corcept knew or suspected that Relator had raised the same complaints directly with the FDA.

116.    In sum, Relator's strenuous and consistent complaints regarding Corcept's illegal and dangerous off-label promotion of Korlym led to his being passed over for well-deserved promotions, and eventually his wrongful termination.

117.    As a result of frequently raising his concerns about off-label marketing with Corcept's management, and his refusal to engage in the off-label promotion of Korlym himself, Relator was terminated on August 1, 2016.

29

**Kickback Scheme**

118.    Relator is also aware that in addition to the off-label marketing of Korlym directly to physicians and healthcare providers, Corcept engaged in improper relationships with third parties to market and promote Korlym for off-label uses.  For example, Korlym appears to have an improper relationship with NORD, whereby Corcept donates substantial monies to NORD as a *quid pro quo* for NORD referring patients to purchase Korlym, without the appropriate safeguards and protocols in place.

119.    Under HHS Office of Inspector General ("OIG") guidance, there were (and are) permissible and impermissible ways in which pharmaceutical companies can assist patients in obtaining medication.  For instance, at the time, although drug companies could make cash donations to patient-assistance charitable organizations, such as NORD, they could not have any other financial relationship.  OIG Adv. Op. 15-16 (Jan. 4, 2016).[15]

120.    To prevent drug companies influencing charities' referrals or provision of services, not only was a charity barred from further financial relationships, the charity may not provide any data or information "related to the identity, amount, or nature of drugs subsidized by the patient assistance program . . . that would enable a [drug company] to correlate the amount or frequency of its donations with the amount or frequency of the use of its drugs." *Id.*

121.    Although Corcept made permissible cash donations to NORD, it also appeared to have both an illicit financial relationship with NORD and impermissible influence over NORD's referrals.

122.    As to the illicit financial relationship, Corcept admitted to receiving financial payments from NORD, in violation of OIG Advisory Opinion 15-16.  (*See* November 1, 2016

---

[15] See also https://oig.hhs.gov/documents/advisory-opinions/9864/AO-24-02.pdf (OIG Advisory Opinion No. 24-02 regarding patient assistance funds).

30

10-Q). Additionally, Corcept admitted that it did not book financial payments from NORD as revenue, meaning it did not account for these payments as taxable income, but elsewhere in its general ledger. (*Id.*).

123. Corcept therefore took a substantial tax deduction for its cash donation but neither (1) disclosed to the IRS that it received this money back, nor (2) paid appropriate taxes on payments received from NORD.

124. As to impermissible influence, the close relationship between NORD and Corcept, and the significant number of patients that NORD referred to Corcept for Korlym, strongly indicated a direct relationship between Corcept's donations to NORD and those referrals, thereby constituting illegal kickbacks.

## OTHER LITIGATION AND NEWS ARTICLES SINCE THE ORIGINAL FILING OF THIS ACTION CORROBORATE RELATOR'S CLAIMS

125. After Relator filed this action in 2017, other litigation and articles in the press have revealed details that corroborate Relator's allegations about off-label marketing and kickback schemes.

126. In 2019, plaintiffs filed a putative securities class action, *Ferraro Family Foundation, Inc. v. Corcept Therapeutics Inc.*, in the United States District Court for the Northern District of California (19-CV-01372-LHK). The plaintiffs in that action raised claims against Corcept, Chief Executive Officer Joseph K. Belanoff, Chief Financial Officer Charles Robb; and Vice President Sean Maduck, including that Corcept engaged in off-label marketing and kickback schemes, as Relator claims here.

127. As summarized by the court decision in the case issued on August 24, 2021, substantially denying Corcept's and the other defendants' motion to dismiss, the Third Amended Complaint in that action relied on "ten physician confidential witnesses ('CWs 1-10')," an expert

31

witness for the plaintiffs, and "four former Corcept employees ('CWs 11-14')." 2021 U.S. Dist. LEXIS 160215, at *10.

128.    The Third Amended Complaint alleged, as summarized by the court in that same opinion, that "Corcept began to aggressively market Korlym for off-label use, both as a (1) treatment for 'patients that did not have a confirmed Cushing's diagnosis and instead, had a general Cushingoid appearance, subclinical Cushing's Syndrome, 'Pre-Cushing's,' [or] poorly controlled diabetes;' and (2) 'as a first-line therapy with no consideration of surgery or as a bridge to surgery.' Marketing Korlym in this manner constitutes off-label promotion, Plaintiffs argue, because it markets Korlym in a manner that contradicts the FDA label, 'which only indicates that Korlym be used as a treatment for the specific situation when surgery has failed or is not a treatment option.'" 2021 U.S. Dist. LEXIS 160215, at *10.

129.    The court also noted that "Plaintiffs provide examples of this alleged off-label marketing scheme for each of their ten physician CWs," which the court summarized as follows:

- CW1, "an Endocrinologist practicing in the Southeastern United States with decades of experience," describes a Corcept clinical specialist, Tyler Franklin, who visited CW1's office frequently between 2017 and 2019. Franklin told CW1 "to use the single 1-mg overnight Dexamethasone suppression test on patients and if the result was even close to positive, to start the patient on Korlym immediately." CW1 also recalls attending a dinner talk by a local internal medicine physician who had received $80,000 in honoraria payments from Corcept in 2017 and 2018. CW1 recalls that the physician "claimed he was using Korlym as a means to reduce high doses of insulin required for treatment of patients' diabetes and, by reducing the dose of insulin, Korlym helped patients lose weight."

- CW2, "a family medicine physician from Oklahoma," recalls a Corcept clinical specialist coming into CW2's office beginning in 2018. CW2 recalls the clinical specialist advising CW2 to look for patients with poorly controlled diabetes who were obese and had hypertension, and to perform a DST on those patients. The clinical specialist told CW2 that if "the DST was positive, then CW2 should immediately start the patients on Korlym." CW2 also recalls being instructed by the clinical specialist to "'close [CW2's] eyes' and not just look for physical symptoms of Cushing's Syndrome because 'anyone could have it.'" "CW2 recalls prescribing Korlym to two patients based on the Corcept rep's off-label marketing message."

32

- CW3, "an Endocrinologist practicing in Nebraska for over 15 years," recalls a Corcept clinical specialist visiting the office between 2017 and 2018 who recommended "that CW3 should test all of CW3's type 2 diabetes patients with a DST and if the DST was positive or in the gray area, to start treating the patient with Korlym." CW3 further recalls that in late 2018 or early 2019, the clinical specialist began "recommending CW3 use Korlym 'proactively' to 'pre-treat' patients with adrenal masses, prior to surgery."

- CW4, "an Endocrinologist practicing in Pennsylvania for over 15 years," recalls being visited by a Corcept clinical specialist from September 2019 until February 2020 who "promot[ed] using a single DST on obese diabetic patients and then, if the DST was positive or in the grey area, to start the patient on Korlym." The clinical specialist further pushed this marketing of Korlym at other events CW4 attended in February of 2020.

- CW5, "an Endocrinologist from New York practicing for over 10 years," had similar experiences with the same clinical specialist between 2017 and 2018. CW5 recalls that the clinical specialist "instructed CW5 to use a single DST on CW5's patients suffering from diabetes and/or obesity," and "if the test was even borderline then to put the patients on Korlym."

- CW6, "an Endocrinologist practicing in West Virginia with over 20 years of experience," described a Corcept clinical specialist telling CW6 "to use Korlym as a diagnostic tool to confirm a Cushing's diagnosis after a single mildly abnormal DST." These conversations took place between the summer of 2019 and October of 2019. After CW6 complained about this conduct, a regional sales manager from Corcept visited CW6's office to "explain[] to CW6 that the sales rep.'s marketing was purportedly consistent with the Korlym FDA-approved label."

- CW7, "an Endocrinologist from New York, practicing for over 6 years," was visited by a Corcept clinical specialist for several years. The clinical specialist told CW7 to "screen everyone who was pre-diabetic, had diabetes, was insulin-resistant or was obese for Cushing's using the DST as a diagnostic tool" and to use "Korlym as a 'bridge' for those awaiting surgery." The clinical specialist also provided CW7 with DST samples and offered to fill out insurance paperwork to get Korlym approved.

- CW8, "an Endocrinologist from Texas practicing for over nine years," recalls that beginning in 2016 or early 2017, a Corcept clinical specialist began "to focus on trying to get CW8 to screen all diabetic and obese patients with the DST," and if the result was positive, to put the patient on Korlym. CW8 recalls the clinical specialist also "inserting case studies into promotional materials that also promoted Korlym for off-label use," and offering to fill out insurance paperwork on CW8's behalf.

- CW9, "an Endocrinologist from Ohio practicing for over twenty years," recalls a clinical specialist who instructed CW9 "to test obese and diabetic patients with a

33

single DST and if the test result was even borderline positive, to put the patient on Korlym right away." The clinical specialist also suggested using Korlym "as a bridge to surgery."

- CW10, "a family medicine physician from California practicing for over 20 years," recalls that a Corcept clinical specialist visited CW10's office between March 2017 and October 2017. The clinical specialist "essentially promoted Korlym as the new treatment for diabetes," and "told CW10 to test CW10's obese and/or diabetic patients with a single DST and if it was even borderline positive to immediately prescribe Korlym." CW10 also recalls the clinical specialist "giving CW10 a tear sheet that promoted Korlym as a front-line therapy for diabetic patients."

2021 U.S. Dist. LEXIS 160215, at *11-16 (internal citations removed).

130.    The court also summarized that "Plaintiffs also provide the allegations of four former Corcept employees who contend that Corcept deployed an off-label marketing scheme during their time at the company." 2021 U.S. Dist. LEXIS 160215, at *16.

131.    The Court provided summary examples of the off-label marketing claims that each of the former employee CWs made in the complaint. The allegations of the CW's, as summarized by the court, as are follows:

- CW12 is a "former Clinical Specialist in the Pacific Northwest region from July 2014 to August 2016 responsible for marketing and managing sales of Korlym to physicians." In 2015, CW12 was told by a manager to mirror what a colleague, Carl Balzanti [top-performing clinical specialist], was doing in order to increase sales of Korlym. "CW12 recalled numerous meetings with Balzanti about promoting Korlym off-label." CW12 alleges that Balzanti "told CW12 that Balzanti was instructing physicians to target patients with mild, subclinical symptoms (diabetes, obesity, Cushingoid appearance etc.) and if any patient's DST returned with a non-zero result, i.e., any cortisol level at all was present after the test, then the patient . . . could be put on Korlym immediately." CW12 alleges that Balzanti spoke with CW12 about marketing Korlym off-label on several other occasions. *Id.* CW12 also recalls that "Defendant Maduck [VP of Commercial] and others would hold Balzanti and [Tyler] Franklin up as the examples on conference calls and at meetings and say how great they have done." Moreover, CW12 alleges that CW12 attended a meeting of clinical specialist at which VP of Sales "Burke told the clinical specialists that 'the goal is to stop making Cushing's Syndrome sound as rare as it is.'"

- CW13 is "a former clinical sales specialist in the Philadelphia region from September 2016 until February 2019 and then the Florida region until CW13's departure in July 2019 responsible for promoting Korlym." CW13 alleges that "Corcept management

34

directed clinical specialists to promote Korlym to physicians as an alternative to an invasive surgery or MRI, stating, why not try Korlym?" CW13 alleges that during a June 2016 sales meeting that Defendant Maduck attended, "a medical science liaison ('MSL') presenter got up on stage and told the Company's clinical specialists about the purported medical benefits of using Korlym to treat off-label conditions such as diabetes or obesity." Moreover, CW13 alleges that during CW13's employment, Defendant Maduck, Tom Burke and other Corcept management pushed clinical specialists like CW13 to find physicians who were willing to prescribe Korlym as a first-line treatment when patient's DST results were in the "grey area" and that Corcept's strategy was to "go to rural areas and find someone" who would be receptive to Korlym.

- CW14 is a "former Regional Manager on the East Coast from April 2016 to May 2019 responsible for overseeing clinical specialists and managing customer sales in CW14's region who reported to Tom Burke during the Class Period." CW14 was aware that physicians were prescribing Korlym even when the DST was below the "1.8 guideline, including as low as 0.7, and that this was happening 'a lot.'" CW14 alleges that "Maduck and Burke told clinical specialists they just needed to find physicians who were willing to prescribe Korlym when the DST came back below the 1.8 medical guidelines."

2021 U.S. Dist. LEXIS 160215, at *16-20 (internal citations removed).

132. The court also summarized that plaintiffs alleged that "Corcept's off-label marketing scheme was furthered by providing clinical specialists with marketing materials to distribute to physicians that promoted off-label use of Korlym." For example, the court stated, "CW12 alleges that in 2016, 'Corcept distributed marketing materials to clinical specialists via email and instructed them to use these materials when speaking with physicians as part of their marketing pitch to convince physicians to use Korlym for the treatment of mild hypercortisolism or subclinical Cushing's Syndrome.'" And, the court stated, "CW12 also alleges that Corcept distributed case studies to clinical specialists that promoted off-label use of Korlym to utilize when meeting with physicians." 2021 U.S. Dist. LEXIS 160215, at *20-21.

133. Further, the court noted, the plaintiffs alleged that "insurance providers suspected that there were a growing number of off-label prescriptions of Korlym" and that in response, "insurers began to tighten their requirements for approving Korlym, beginning in 2018."

Plaintiffs named the insurers who tightened their review process. 2021 U.S. Dist. LEXIS 160215, at *20-21.

134. Finally, the court noted that plaintiffs alleged that "the rapid increase in prescriptions for Korlym coincided with an increase in patient deaths while using Korlym," noting "17 reported deaths of patients on Korlym in 2017," 40 reported deaths in 2018, and 19 reported deaths in 2019. 2021 U.S. Dist. LEXIS 160215, at *21.

135. In 2023, Corcept settled the purported class action for $14 million.[16]

136. Press articles published since Relator first filed this *qui tam* action have also served to corroborate many of Relator's claims.

137. An article published on January 25, 2019 by the Foundation for Financial Journalism, which provides investigative reporting, explored Corcept's off-label marketing and related issues. Titled "Corcept Therapeutics: The Company That Perfectly Explains the Health Care Crisis," the article discussed the history of Corcept and Korlym.[17] The article contained numerous findings and quotations that serve to corroborate Relator's claims, including as follows:

- "Asked about the recent sharp increase in the number of deaths recorded for Korlym in the FDA's adverse events reporting system (FAERS), to 37 in the first nine months of 2018 from 17 for all of 2017, [Corcept CFO Charles] Robb was adamant that none of the deaths could be directly attributed to Korlym. In response to a question about how he could be certain of that, he said, 'All [the FAERS death reports] are adjudicated by a third party": Robb added that Corcept retains Ashfield to provide pharmacovigilance, a service that evaluates reports of a drug's adverse events for a manufacturer. And he insisted that the medicine and its dosage were not responsible for any of 103 deaths reported for Korlym since 2012. He did not answer a question about why 17 of the 103 death reports mentioned "product used for unknown indication.'"

---

[16] https://ir.corcept.com/news-releases/news-release-details/corcept-therapeutics-announces-preliminary-settlement-purported

[17] https://ffj-online.org/2019/01/25/corcept-therapeutics-the-company-that-perfectly-explains-the-health-care-crisis/

- "Robb did, however, have a lengthy list of possible causes for these deaths: 'The thing to understand is these patients are very ill. Some of them have adrenal cancer,' he said, 'Some of them ahead have been suffering from the symptoms of Cushing's syndrome for decades; some are simply elderly and the list of medications these patients have to take can be 20 and 30 drugs long.'"

- "Eleven of the 15 doctors who are the most frequent prescribers of Korlym to Medicare Part D enrollees received at least $7,500 in speakers bureau payments from Corcept in 2016 and 2017 combined. (The centers' Open Payments Data portal lists payments only to medical doctors and not physician assistants; its data for 2018 will be released in May, along with 2017 Medicare Part D data for Korlym.)  A savvy observer might suspect that Corcept is using its speakers bureau program to compensate doctors for prescribing Korlym."

- "Another thing that stands out in the list of high-volume Korlym prescribers is their peculiar geographic clustering. Cushing's syndrome is a rare disease. The FDA has estimated that the number of people in the United States who could be prescribed this drug is 5,000. So some medical experts might be surprised to see Korlym prescribers found mainly in small towns and modest-sized cities, many at a substantial distance from established medical research centers. (For example, Dr. John C. Parker, a Wilmington, North Carolina–based endocrinologist, wrote at least 41 Korlym prescriptions in 2016. But one would have expected instead that some larger-volume prescribers would be located, say, in the state's heavier populated Durham and Chapel Hill area, where two pituitary disorder clinics are affiliated with prominent university hospitals. Wilmington, though, is about 2.5 hours by car from these clinics.)  Could these doctors based in smaller communities with a limited pool of patients to draw from be prescribing Corcept to patients merely with diabetes — instead of endogenous Cushing's syndrome?"

- "When Corcept's CFO Robb was asked during the late December interview if his company was using its speakers bureau program to encourage doctors to prescribe the drug for off-label uses, he said the company was doing no such thing. He argued that the FDA's estimate of 5,000 U.S. patients who could potentially take the drug was somewhat arbitrary and nearly seven years old. He said that a better figure, based on research by Corcept and Novartis, is closer to 20,000. (Novartis is in the late stages of testing its own Cushing's syndrome drug.) In addition, Robb said that as awareness of Korlym grows, doctors will realize that more of their patients have Cushing's syndrome, and the clustering of Korlym prescribers in smaller communities happened only because one group of physicians recognized earlier than their colleagues how the disease could be treated."

- "Pressed on the unusual odds of so many prescriptions for a treatment of such a rare disease from doctors in Zanesville, Ohio and Murfreesboro, Tennessee, Robb declared that 'over 90 percent' of all Korlym prescriptions were 'on label.' He added that 'since it's an expensive drug,' nearly all commercial insurers have an extensive preapproval process before paying for the drug."

37

- "Robb's full-throated defense of Corcept's business practices would make more sense if not for the company's relationship with Dr. Hanford Yau. An endocrinologist, Dr. Yau sees patients at an Orlando Veterans Administration Medical Center's clinic. According to records obtained by the Southern Investigative Reporting Foundation, Yau and his colleagues at the VA clinic prescribed Korlym for 84 people from early 2016 to Sept. 1, 2018. Yau wrote 27 of the prescriptions. A back of the envelope calculation, using 2017's sales and prescription volume, illustrates how important the clinic is to Corcept: VA records from that year reveal that 50 people began taking Korlym through prescriptions written by the clinic's doctors. With their medication costing the then-prevailing price of $290,304 a year (or $24,192 a month), these 50 patients generated more than $14.51 million in sales, or 9.1 percent, of the company's $159.2 million in 2017 revenue. (Of course, some of those taking the drug in 2017 might have started only in the middle of the year. And the figure excludes patients who had already begun taking Korlym in previous years and stayed on the drug.)"

- "Moreover, just as his clinic had become so central to Corcept's economic well-being, Dr. Yau became the company's leading recipient of speakers bureau payments. In 2017 he received $95,139 from the company — over 12 percent of Corcept's total payments to medical professionals — a more than sevenfold increase from 2016's $13,524, according to the Centers for Medicare & Medicaid Services' Open Payment Data portal. (But in 2014 and 2015 combined, Yau was paid just $4,610.) The second leading recipient of the company's speakers bureau cash in 2017 was Dr. Joseph Mathews of Summerville, South Carolina, who was paid $73,777. None of these payments were for research purposes, according to the Open Payments Data portal. Nor does Dr. Yau's name surface on ClinicalTrials.gov, the U.S. National Library of Medicine's database of public and private clinical studies."

- "Asked several times about this doctor's relationship to his company, CFO Robb would speak only in broad terms about the speakers bureau program's goals without discussing Dr. Yau. He did not answer a follow-up question sent via email. And Dr. Yau did not reply to a phone message or email."

- "Through a Freedom of Information Act request, the Southern Investigative Reporting Foundation obtained emails between Dr. Yau and Corcept that show he was working with an Italian endocrinologist and another VA colleague to create a white paper for marketing Korlym to 'community physicians.' The expectation for a peer-reviewed medical journal article is that an investigator's research is conducted independently from consultations with a drug's manufacturer. But the emails obtained through the FOIA request, as shown in the image below, show that Corcept was entirely in control of this project conceptually and editorially. (The image also reveals where the VA redacted the name of the person directing the project for Corcept and other related identifiers.)" [image omitted.]

- "In addition, the fact that the Orlando VA Medical Center generates so many Korlym prescriptions is rather curious. The patient base of the VA's medical system nationwide has in recent years been more than 91 percent male, according to the department's analysis of those using its services from 2006 to 2015. But Cushing's syndrome typically

38

occurs in women rather than men, by an almost 5-to-1 ratio, according to the National Organization of Rare Disorders."

138.    An article published in The Capitol Forum on February 6, 2023, with the headline "Corcept: Medicare Prescriptions Appear to Outpace Prevalence of Eligible Population for Korlym; Medicare and Michigan Data Raise Concerns About Marketing Strategy," discussed apparent off-label marketing by the company. Relator provided background information to the reporter for the article but was not a quoted source.

139.    The article began: "The number of Medicare-age people who are eligible for on-label prescriptions of Corcept Therapeutic's (CORT) flagship drug Korlym for treatment of Cushing's Syndrome is extremely small, just a subset of the 10 to 15 people per million who have Cushing's to begin with. However, a Capitol Forum investigation finds that prescriptions for Korlym in the Medicare Part D program far outpace the expected number of patients."

140.    The article continued:

> The findings are more striking given that Cushing's most commonly occurs in people between the ages of 20 and 50, outside the age range of the typical Medicare beneficiary. Moreover, Korlym's narrow indication for use is for those who develop diabetes from Cushing's and who are not eligible for curative surgery, a step that about half the people with Cushing's Disease opt for, according to Corcept's SEC filings.

> In 2020, for example, there were roughly 47 million people enrolled in a Medicare Part D plan. Using the upper limit of the estimated prevalence (15 patients out of a million) and excluding age-based restrictions, 705 Medicare Part D beneficiaries would be expected to have had Cushing's in 2020, with a smaller portion of those 705 likely meeting the narrow criteria to be treated by Korlym. However, Medicare prescription data shows 729 Medicare Part D beneficiaries filled at least one Korlym prescription in 2020, the most recent year of data available.

> Further, Medicare Part D beneficiaries .in some states, such as Michigan, North Carolina, Ohio, South Carolina, and Texas filled a disproportionately high number of Korlym prescriptions

when considering the number of Medicare Part D enrollees in those states and the expected prevalence of Cushing's.

141. The Capitol Forum followed up with another article focused on potential off-label marketing by Corcept, published on September 13, 2024, with the headline, "Corcept Therapeutics: Former Employees Say Company Pushes Doctors to Bypass Scans Needed to Fully Inform Cushing's Syndrome Treatment Options." Relator was not a source for this article.

142. The 2024 article noted that the "vast majority of Cushing's syndrome patients can be cured through surgical removal of the tumor," with Korlym an option only for those for which surgical intervention "cannot be performed." The article noted that "[t]hose factors limit the total market for Korlym to a small subset of those with the rare disease, with only a handful of patients out of a million meeting the criteria."

143. The article then said that, according to one former employee, Corcept marketing "started focusing their efforts on doctors that were more likely to forgo patient scans to identify pituitary or adrenal tumors and instead go straight to prescribing Korlym. Patients in that area were increasingly being diagnosed using a diagnosis code known as E24.9, which indicated unsourced Cushing's syndrome."

144. The article further stated that, according to a second former Corcept employee, "the rates of patients with E24.9-type Cushings were ballooning because Corcept was 'just focusing on biochemical testing with a dexamethasone suppression, ACTH, or DHEAS test to confirm extra cortisol and then nothing else, no CT scan or MRI to actually confirm a location and perform surgery to cure the patient. They were skipping scans entirely in order to push medical therapy first.'"

40

## COUNT ONE
## FALSE CLAIMS ACT: PRESENTING OR CAUSING
## FALSE OR FRAUDULENT CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

145.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

146.   By virtue of the acts alleged herein, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

147.   Defendant submitted bills to the Government for payment and retained improperly obtained payments arising from its promotion and sale of Korlym for improper off-label purposes.  All such false claims were knowingly submitted to get false or fraudulent claims paid or approved by the Government.

148.   As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $14,308 and up to $28,619 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

## COUNT TWO
## FALSE CLAIMS ACT: SUBMISSION OF FALSE CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

149.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

150.   By virtue of the acts alleged herein, Defendant knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, the false certifications and representations made or caused to be made by Defendant—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

41

151. By submitting claims for payment and retaining improperly obtained payments, Defendant expressly and impliedly, if falsely, certified to its compliance with the relevant Government and CMS regulations authorizing such payments.

152. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

## COUNT THREE
## FALSE CLAIMS ACT: FALSE RECORDS OR STATEMENTS
## (31 U.S.C. § 3729(a)(1)(B))

153. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

154. Defendant submitted false records or statements to the Government representing that Defendant was entitled to payment and approval for the sale of Korlym for improper off-label purposes. All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

155. Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

156. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

42

## COUNT FOUR
## FALSE CLAIMS CONSPIRACY
## (31 U.S.C. § 3729(a)(1)(C))

157. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

158. Defendant entered into a conspiracy or conspiracies through their employees and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for the promotion and sale of Korlym for improper off-label purposes.

159. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

## COUNT FIVE
## FALSE CLAIMS ACT: REVERSE FALSE CLAIMS
## (31 U.S.C. § 3729(a)(1)(G))

160. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

161. By virtue of the acts alleged herein, the Defendant knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay, transmit or return money to the Government.

162. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

43

## COUNT SIX
## FALSE CLAIMS ACT RETALIATION
## (31 U.S.C. § 3730(h))

163.   All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

164.   As set forth above, in August 2016, Relator was terminated from Corcept as a result of repeatedly raising with his superiors his legal and ethical concerns with the off-label marketing detailed herein.

165.   Relator's strenuous and consistent complaints regarding Corcept's illegal and dangerous off-label promotion of Korlym led to his being passed over for well-deserved promotions, and eventually his wrongful termination

166.   By virtue of the acts alleged herein, Defendant Corcept threatened, harassed, and/or dismissed, and/or discriminated against Relator in the terms and conditions of his employment in violation of 31 U.S.C. § 3730(h).

167.   Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## COUNT SEVEN
## NEW JERSEY FALSE CLAIMS ACT
## (N.J.S.A. 2A:32C-1, et seq.)

168.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

169.   As a result of the conduct described in these allegations, Defendant has violated sections (a), (b), (c), and (g) of N.J.S.A. 2A:32C-3, defining liability under the NJFCA.

170.   During the Covered Period, Defendant has (1) knowingly presented or caused to be presented to the New Jersey State Government a false or fraudulent claim for payment or approval, as contemplated by 2A:32C-3(a); (2) knowingly made, used, or caused to be made or

44

used a false record or statement to get a false or fraudulent claim paid or approved by the New Jersey State Government, as contemplated by 2A:32C-3(b); (3) conspired to defraud the New Jersey State Government by getting a false or fraudulent claim allowed or paid by the New Jersey State Government, as contemplated by 2A:32C-3(c); and (4) knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State, as contemplated by 2A:32C-3(g).

171.    Specifically, Defendant submitted or caused to be submitted invoices and other statements containing false and fraudulent claims for payment and approval by New Jersey State Government Programs knowing the claims were not entitled to such payment or approval, and retained improperly obtained payments that they knew were required to be refunded to the New Jersey State Government Programs. Beginning in at least 2014 and continuing to the present, every invoice submitted by Defendant, its agents, or contractors or subcontractors for the improper off-label use of Korlym constitutes a false claim under the above provisions of the NJFCA.

172.    As a result of Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

173.    The State of New Jersey is entitled to a civil penalty for each false or fraudulent claim of not less than and not more than the civil penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as may be adjusted in accordance with the inflation adjustment procedures prescribed in the federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the State sustains arising from Defendant's unlawful conduct as described herein.

45

## COUNT EIGHT
## CALIFORNIA FALSE CLAIMS ACT
### (Cal. Gov't Code §§ 12650, *et seq.*)

174. All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

175. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment.

176. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve or pay such false and fraudulent claims.

177. By virtue of the acts described above, the Defendant conspired to violate the California False Claims Act.

178. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

179. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of California state funds.

180. By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

181. The State of California is entitled to the maximum statutory penalty and for up to three times the amount of damages sustained by the state for each and every false or fraudulent

46

claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT NINE**
**CALIFORNIA FALSE CLAIMS ACT**
**ANTI-RETALIATION PROVISION**
**(Cal. Gov't Code § 12653)**
*(Against Defendant Corcept Only)*

182.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

183.    Under the CFCA, it is illegal for an employer to discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee on behalf of the employer or others in disclosing information to a State or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under the CFCA.  Cal. Gov't Code § 12653.

184.    An employer who violates the above provision is liable for all relief necessary to make the employee whole, including reinstatement with the same seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and, where appropriate, punitive damages. In addition, the defendant shall be required to pay litigation costs and reasonable attorney's fees associated with the action.

185.    To obtain the above relief, an employee must show that (1) he or she voluntarily disclosed information to a State or law enforcement agency or acts in furtherance of a false claims action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed; and (2) the employee had been harassed, threatened with termination or

47

demotion, or otherwise coerced by the employer or its management into engaging in the fraudulent activity in the first place.

186.    As detailed above, the Relator faced harassment, denial of promotion, wrongful termination and other mistreatment by Defendant Corcept Therapeutics in violation of the CFCA as a result of Relator raising his legal and ethical concerns regarding Defendant's malfeasance and refusing to engage in the off-label promotion and sale of Defendant Corcept Therapeutics' product, Korlym.

187.    Relator seeks compensatory damages and other appropriate statutory relief pursuant to Cal. Gov't Code § 12653.

**COUNT TEN**
**COLORADO FALSE CLAIMS ACT**
**(Colo. Stat. Ann. §§ 24-31-1201, _et seq._)**

188.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

189.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment and approval.

190.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

191.    By virtue of the acts described herein, Defendant conspired to violate the Colorado False Claims Act.

192.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid

48

and continue to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

193. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Colorado state funds.

194. By reason of the Defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

195. Pursuant to Colo. Stat. Ann. §§24-31-1203 *et seq.,* Colorado is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT ELEVEN**
**CONNECTICUT FALSE CLAIMS ACT**
**(Conn. Gen. Stat. §§ 4-274, *et seq.*)**

196. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

197. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment and approval.

198. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

199. By virtue of the acts described herein, Defendant conspired to violate the Connecticut False Claims Act.

49

200.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

201.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Connecticut state funds.

202.    By reason of the Defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

203.    Pursuant to Conn. Gen. Stat. §§ 4-274, *et seq.*, Connecticut is entitled to three times the amount of actual damages plus the maximum statutory penalty as adjusted from time to time by the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT TWELVE**
**DELAWARE FALSE CLAIMS AND REPORTING ACT**
**(Del Code Ann. tit. 6, §§ 1201, *et seq.*)**

204.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

205.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

206.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

207.    By virtue of the acts described herein, Defendant conspired to violate the Delaware False Claims and Reporting Act.

208.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

209.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Delaware state funds.

210.    By reason of the Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

211.    Pursuant to Del Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT THIRTEEN**
**FLORIDA FALSE CLAIMS ACT**
**(Fla. Stat. Ann. §§ 68.081, *et seq.*)**

212.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

213.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

214.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

215.   By virtue of the acts described herein, Defendant conspired to violate the Florida False Claims Act.

216.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

217.   Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Florida state funds.

218.   By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

219.   ursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT FOURTEEN**
**GEORGIA FALSE MEDICAID CLAIMS ACT**
**(Ga. Code. Ann. §§ 49-4-168, *et seq.*)**

220. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

221. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

222. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

223. By virtue of the acts described herein, Defendant conspired to violate the Georgia False Medicaid Claims Act.

224. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

225. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Georgia state funds.

226. By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

227. Pursuant to Ga. Code. Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every

53

false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT FIFTEEN
## HAWAII FALSE CLAIMS TO THE STATE ACT
### (Haw. Rev. Stat. §§ 661-21, *et seq.*)

228.   All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

229.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

230.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

231.   By virtue of the acts described herein, Defendant conspired to violate the Hawaii False Claims to the State Act.

232.   The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

233.   Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Hawaii state funds.

234.   By reason of the Defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

54

235.   Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT SIXTEEN**
**ILLINOIS FALSE CLAIMS ACT**
**(740 Ill. Comp. Stat. Ann. §§ 175/1, *et seq.*)**

236.   All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

237.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

238.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

239.   By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve or pay such false and fraudulent claims.

240.   By virtue of the acts described herein, Defendant conspired to violate the Illinois False Claims Act.

241.   The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

242.   Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Illinois state funds.

243.   By reason of Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

244.   The State of Illinois is entitled to the maximum statutory penalty and for up to three times the amount of damages sustained by the state for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT SEVENTEEN**
**INDIANA MEDICAID FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**
**(Ind. Code §§ 5-11-5.7, *et seq.*)**

245.   All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

246.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

247.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

248.   By virtue of the acts described herein, Defendant conspired to violate the Indiana Medicaid False Claims and Whistleblower Protection Act.

249.   The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid

and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

250. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Indiana state funds.

251. By reason of the Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

252. Pursuant to Ind. Code § 5-11-5.7-2, the State of Indiana is entitled to the maximum statutory penalty, as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990, and for up to three times the amount of damages sustained by the state for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

### COUNT EIGHTEEN
### IOWA FALSE CLAIMS ACT
### (Iowa Code §§ 685.1, *et seq.*)

253. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

254. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

255. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

256.    By virtue of the acts described herein, Defendant conspired to violate the Iowa False Claims Act.

257.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

258.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Iowa state funds.

259.    By reason of the Defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

260.    Pursuant to Iowa Code § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT NINETEEN
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### (La. Rev. Stat. Ann. §§ 46:437.1, *et seq.*)

261.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

262.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

58

263.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

264.    By virtue of the acts described herein, Defendant conspired to violate the Louisiana Medical Assistance Program Integrity Law.

265.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

266.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Louisiana state funds.

267.    By reason of the Defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

268.    Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum statutory penalty, adjusted according to the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT TWENTY
## MARYLAND FALSE HEALTH CLAIMS ACT
### (Md. Code, Health-Gen. §§ 2-601 *et seq.*)

269.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

59

270. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

271. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

272. By virtue of the acts described herein, Defendant conspired to violate the Maryland False Health Claims Act.

273. The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

274. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Maryland state funds.

275. By reason of the Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

276. Pursuant to Md. Code, Health-Gen. § 2-602(b), the State of Maryland is entitled to three times the amount of actual damages plus the maximum statutory penalty, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT TWENTY-ONE
## MASSACHUSETTS FALSE CLAIMS ACT
### (Mass. Gen. Laws ch. 12, §§ 5, *et seq.*)

277. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

278. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

279. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts Commonwealth Government to approve and pay such false and fraudulent claims.

280. By virtue of the acts described herein, Defendant conspired to violate the Massachusetts False Claims Act.

281. The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

282. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Massachusetts state funds.

283. By reason of the Defendant's acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

284. Pursuant to Mass. Gen. Laws ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum statutory penalty, as

61

adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT TWENTY-TWO
## MICHIGAN MEDICAID FALSE CLAIM ACT
### (Mich. Stat. §§ 400.601, *et seq.*)

285.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

286.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the State of Michigan for payment or approval.

287.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

288.    By virtue of the acts described herein, Defendant conspired to violate the Michigan Medicaid False Claims Act.

289.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

290.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Michigan state funds.

291.    By reason of the Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

62

292.    Pursuant to Mich. Stat. § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT TWENTY-THREE
## MINNESOTA FALSE CLAIMS AGAINST THE STATE ACT
### (Minn. Stat. §§ 15C.01, *et seq.*)

293.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

294.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

295.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

296.    By virtue of the acts described herein, Defendant conspired to violate the Minnesota False Claims Against the State Act.

297.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

63

298.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Minnesota state funds.

299.    By reason of the Defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

300.    Pursuant to Minn. Stat. § 15C.02, Minnesota is entitled to three times the amount of actual damages, plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT TWENTY-FOUR**
**MONTANA FALSE CLAIMS ACT**
**(Mont. Code Ann. §§ 17-8-401, *et seq.*)**

301.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

302.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

303.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

304.    By virtue of the acts described herein, Defendant conspired to violate the Montana False Claims Act.

305.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid

and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

306. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Montana state funds.

307. By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

308. Pursuant to Mont. Code Ann. § 17-8-403, Montana is entitled to three times the amount of actual damages, plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT TWENTY-FIVE**
**NEVADA FALSE CLAIMS ACT**
**(Nev. Rev. Stat. §§ 357.010, _et seq._)**

309. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

310. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

311. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

312. By virtue of the acts described herein, Defendant conspired to violate the Nevada False Claims Act.

313.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

314.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Nevada state funds.

315.    By reason of the Defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

316.    Pursuant to Nev. Rev. Stat. § 357.040(2), the State of Nevada is entitled to three times the amount of actual damages plus the maximum statutory penalty, as adjusted to correspond to any adjustments in the monetary amount of a civil penalty for a violation of the federal False Claims Act, 31 U.S.C. § 3729(a), made by the Attorney General of the United States in accordance with the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

### COUNT TWENTY-SIX
### NEW MEXICO MEDICAID FALSE CLAIMS ACT
### (N.M. Stat. Ann. §§ 27-14-1, *et seq.*)

317.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

318.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

66

319. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

320. By virtue of the acts described herein, Defendant conspired to violate the New Mexico Medicaid False Claims Act.

321. The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

322. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of New Mexico state funds.

323. By reason of the Defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

324. Pursuant to N.M. Stat. Ann. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT TWENTY-SEVEN**
**NEW YORK FALSE CLAIMS ACT**
**(N.Y. State Fin. Law §§ 187, *et seq.*)**

325. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

326. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

327. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

328. By virtue of the acts described herein, Defendant conspired to violate the New York False Claims Act.

329. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

330. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of New York state funds.

331. Moreover, as set forth above, Defendant Corcept has been hiding revenues–and thus taxable income–from the IRS and New York State taxing authorities through its impermissible relationship with NORD, making its state tax filings purposefully inaccurate and constituting a further violation of the New York False Claims Act.

332. By reason of the Defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

333. Pursuant to N.Y. State Fin. Law § 189.1(h), the State of New York is entitled to three times the amount of actual damages, including consequential damages, plus the maximum

68

statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT TWENTY-EIGHT
## NORTH CAROLINA FALSE CLAIMS ACT
### (N.C. Gen Stat. §§ 1-607, *et seq.*)

334.    All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

335.    This is a claim for damages and penalties under the North Carolina False Claims Act.

336.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

337.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the North Carolina State Government to approve or pay such false and fraudulent claims.

338.    By virtue of the acts described above, Defendant conspired to violate the North Carolina False Claims Act.

339.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements.

340.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to North Carolina Medicaid.

69

341.    By reason of the Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

342.    Pursuant to N.C. Gen Stat. § 1-607, the State of North Carolina is entitled to three times the amount of actual damages and the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT TWENTY-NINE**
**OKLAHOMA MEDICAID FALSE CLAIMS ACT**
**(63 Okla. St. Ann. §§ 5053,** *et seq.***)**

343.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

344.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

345.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

346.    By virtue of the acts described above, Defendant conspired to violate the Oklahoma Medicaid False Claims Act.

347.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

348.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Oklahoma.

349.    By reason of Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

350.    Pursuant to 63 Okl. St. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum statutory penalty, unless a penalty is imposed for the act of that person in violation of the federal False Claims Act for the same or a prior action, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT THIRTY
## RHODE ISLAND FALSE CLAIMS ACT
### (R.I. Gen. Laws §§ 9-1.1-1, *et seq.*)

351.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

352.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

353.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

354.    By virtue of the acts described above, Defendant conspired to violate the Rhode Island False Claims Act.

71

355.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

356.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Rhode Island.

357.    By reason of the Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

358.    Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

### COUNT THIRTY-ONE
### TENNESSEE MEDICAID FALSE CLAIMS ACT
### (Tenn Code Ann. §§ 71-5-181, *et seq.*)

359.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

360.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

361.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

72

362.   By virtue of the acts described above, Defendant conspired to violate the Tennessee Medicaid False Claims Act.

363.   The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

364.   Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Tennessee.

365.   By reason of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

366.   Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum statutory penalty, adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT THIRTY-TWO**
**TEXAS MEDICAID FRAUD PREVENTION ACT**
**(Tex. Hum. Res. Code §§ 36.001, _et seq._)**

367.   All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

368.   Under the Texas Medicaid Fraud Prevention Act ("TMFPA"), an unlawful act subjects a defendant to liability for the value of payment related to the unlawful act.

369.   There are thirteen unlawful acts specified in the TMFPA:

73

a. knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

b. knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

c. knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

d. knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as: (i) a hospital; (ii) a nursing facility or skilled nursing facility; (iii) a hospice; (iv) an ICF-IID; (v) an assisted living facility; or (vi) a home health agency; or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

e. except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

f. knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: (A) is not

74

licensed to provide the product or render the service, if a license is required; or (B) is not licensed in the manner claimed;

g. knowingly makes or causes to be made a claim under the Medicaid program for: (A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

h. makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

i. conspires to commit a violation of these enumerated acts;

j. is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly: (A) fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract; (B) fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or (C) engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

k. knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

75

l.      knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

m.      knowingly engages in conduct that constitutes a violation under Section 32.039(b).

370.    By virtue of the facts set forth above, Defendant committed unlawful acts as defined by the TMFPA.

371.    By virtue of the facts described above, Defendant conspired to commit unlawful acts, in violation of the TMFPA.

372.    Pursuant to Tex. Hum. Res. Code Ann. § 36.052, a person who commits an unlawful act is liable to the State of Texas for: (1)  the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party; (2)  interest on the amount of the payment or the value of the benefit described by Subdivision (1); (3)  a civil penalty; and (4)  two times the amount of the payment or the value of the benefit described by Subdivision (1).

373.    Accordingly, the State of Texas is entitled to two times the amount of  any payments obtained by the Defendant from the Texas Medicaid program as a result of Defendant's unlawful acts, along with appropriate interest and civil penalties.

76

## COUNT THIRTY-THREE
## VERMONT FALSE CLAIMS ACT
### (32 V.S.A. §§ 630, *et seq.*)

374. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

375. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

376. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

377. By virtue of the acts described above, Defendant conspired to violate the Vermont False Claims Act.

378. The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

379. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Vermont.

380. By reason of Defendant's acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

381. Pursuant to 32 V.S.A. § 631, the State of Vermont is entitled to three times the amount of actual damages plus the maximum statutory penalty, as adjusted by the federal Civil

77

Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT THIRTY-FOUR**
**VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**(Va. Code Ann. §§ 8.01-216.1, *et seq.*)**

382.　All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

383.　By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Commonwealth Government for payment or approval.

384.　By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

385.　By virtue of the acts described above, Defendant conspired to violate the Virginia Fraud Against Taxpayers Act.

386.　The Virginia Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

387.　Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Virginia.

388.　By reason of Defendant's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

389. Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT THIRTY-FIVE
## WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
### (Wash. Rev. Code Ann. §§ 74.66.005, *et seq.*)

390. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

391. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

392. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

393. By virtue of the acts described above, Defendant conspired to violate the Washington Medicaid Fraud False Claims Act.

394. The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

395. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to Washington.

79

396. By reason of Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

397. Pursuant to Wash. Rev. Code Ann. § 74.66.020, the State of Washington is entitled to three times the amount of actual damages plus the maximum statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT THIRTY-SIX
## DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### (D.C. Code Ann. §§ 2-381.01, *et seq.*)

398. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

399. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

400. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

401. By virtue of the acts described above, Defendant conspired to violate the District of Columbia False Claims Act.

402. The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant as alleged herein.

80

403.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of local and federal funds to the District of Columbia.

404.    By reason of the Defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

405.    Pursuant to D.C. Code Ann. § 2-308.02, the District of Columbia is entitled to three times the amount of actual damages plus the maximum statutory penalty, as adjusted pursuant to D.C. Code Ann. § 2-308.10, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT THIRTY-SEVEN
## CALIFORNIA INSURANCE FRAUD PREVENTION ACT
### (Cal Ins. Code §§ 1871.7, *et seq.*)

406.    All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

407.    This is a claim for treble damages and penalties under the CIFPA.

408.    Pursuant to Cal. Ins. Code § 1871.4(a), it is unlawful to:

> (1)    Make or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.
>
> (2)    Present or cause to be presented a knowingly false or fraudulent written or oral material statement in support of, or in opposition to, a claim for compensation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.
>
> (3)    Knowingly assist, abet, conspire with, or solicit a person in an unlawful act under this section.
>
> (4)    Make or cause to be made a knowingly false or fraudulent statement with regard to entitlement to benefits with the intent to discourage an injured worker from claiming benefits or pursuing a claim. . . .

409.    By virtue of the acts described above, Defendant knowingly utilized a scheme by which they presented, or caused to be presented, false or fraudulent claims to private insurers in California, or for patients in California that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendant could file claims for payment or approval) in violation of each patient's private health insurance contract.

410.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

411.    By virtue of the acts described above, Defendant conspired to violate the CIFPA and each patient's private health insurance contract.

412.    The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

413.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligation to return overpayments to these private insurance companies.

414.    By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

415.    Each claim for reimbursement that was a result of Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

82

416.    The State of California is entitled to the maximum statutory penalty per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented or caused to be made, used, or presented by Defendant.

## COUNT THIRTY-EIGHT
## ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT
## (740 Ill. Comp. Stat. §§ 92/1, *et seq.*)

417.    All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

418.    This is a claim for treble damages and penalties under the IICFPA.

419.    Pursuant to 740 Ill. Comp. Stat. § 92/5(a):

> A person who violates any provision of this Act, . . . or Section 17-10.5 of the Criminal Code . . . shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

420.    720 Ill. Comp. Stat. § 5/17-10.5 provides, in pertinent part:

> (a) Insurance fraud.
>
> (1) A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.
>
> (2) A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.
>
> \* \* \*
>
> (c) Conspiracy to commit insurance fraud. . . .

83

421. By virtue of the acts described above, Defendant knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois that those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

422. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

423. Defendant knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

424. By virtue of the acts described above, Defendant knowingly utilized a scheme by which they presented, or caused to be presented, false or fraudulent claims to private insurers in Illinois, or for patients in Illinois that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendant could file claims for payment or approval) in violation of each patient's private health insurance contract.

425. By virtue of the acts described above, Defendant conspired to violate the IICFPA and each patient's private health insurance contract.

426. The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

427. Defendant knowingly submitted and/or caused to be made or used false records or

false statements in order to avoid or decrease its obligations to return overpayments to these private insurance companies.

428. By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

429. Each claim for reimbursement that was a result of Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

430. The State of Illinois is entitled to the maximum statutory penalty per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented, or caused to be made, used, or presented by Defendant.

### **PRAYER FOR RELIEF**

WHEREFORE, on each of these claims, Relator requests the following relief be ordered:

### **As to the Federal Claims:**

A. Pursuant to 31 U.S.C. § 3729(a), Defendant pays an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, which Relator currently estimates to be in the tens of millions of dollars, plus a civil penalty of $22,363 for each false or fraudulent claim or such other penalty as the law may permit and/or require for each violation of the FCA;

B. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

C. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law;

D. Relator be awarded all back pay and associated damages, including all costs, expenses and attorney's fees, as provided pursuant to the FCA, 31 U.S.C. §3730(h);

E.    Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

F.    Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendant's actions, as well as the maximum statutory civil penalty for each violation by Defendant within each State, all as provided by:

      i.    Cal. Gov't Code § 12651;

      ii.    Cal. Ins. Code § 1871.7(b);

      iii.    Colo. Stat. Ann. § 24-31-1203;

      iv.    Conn. Gen. Stat. § 4-275;

      v.    6 Del. C. § 1201;

      vi.    Fla. Stat. Ann. § 68.082;

      vii.    Ga. Code. Ann. § 49-4-168.1;

      viii.    Haw. Rev. Stat. § 661-21;

      ix.    740 Ill. Comp. Stat. Ann. § 175/3;

      x.    740 Ill. Comp. Stat. § 92/5(b);

      xi.    Ind. Code § 5-11-5.7-2;

      xii.    Iowa Code § 685.2;

      xiii.    La. Rev. Stat. § 46:438.6;

      xiv.    Md. Code, Health-Gen. § 2-602;

      xv.    Mass. Gen. Laws Ch. 12 § 5B;

      xvi.    Mich. Comp. Laws § 400.612;

    xvii.  Minn. Stat. § 15C.01;

    xviii.  Mont. Code Ann. § 17-8-403;

    xix.  Nev. Rev. Stat. Ann. § 357.040;

    xx.  N.J.S.A. 2A:32C-3;

    xxi.  N.M. Stat. Ann. § 27-14-4;

    xxii.  N.Y. Fin. Law § 189.1(g);

    xxiii.  N.C. Gen. Stat. § 1-607;

    xxiv.  63 Okla. St. Ann. § 5053.1;

    xxv.  R.I. Gen. Laws 9-1.1-3;

    xxvi.  Tenn. Code Ann. § 71-5-182;

    xxvii.  32 V.S.A. § 631;

    xxviii.  Va. Code Ann. § 8.01-216.3;

    xxix.  Wash. Rev. Code Ann. § 74.66.020;

    xxx.  D.C. Code Ann. § 2-308.14; and

G.    Relator and Plaintiff State of Texas be awarded  two times the amount of any payment or the value of any monetary or in-kind benefit provided under the Texas Medicaid program, directly or indirectly, as a result of the unlawful acts described above, plus interest on the amount of the payment or the value of the benefit, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

H.    Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to:

    i.  Cal. Gov't Code § 12651(g)(2);

    ii.  Cal. Ins. Code § 1871.7;

    iii.   Colo. Stat. Ann. § 24-31-1203;

    iv.   Conn. Gen. Stat. §§ 4-278, 4-279;

    v.   6 Del. C. § 1205;

    vi.   Fla. Stat. Ann. § 68.085;

    vii.   Ga. Code. Ann. § 49-4-168.2(i);

    viii.   Haw. Rev. Stat. § 661-27;

    ix.   740 Ill. Comp. Stat. Ann. § 175/4(d);

    x.   740 Ill. Comp. Stat. Ann. § 92/25;

    xi.   Ind. Code § 5-11-5.7-6;

    xii.   Iowa Code § 685.3;

    xiii.   La. Rev. Stat. § 46:439.4;

    xiv.   Md. Code, Health-Gen. § 2-605;

    xv.   Mass. Gen. Laws Ch. 12 § 5F;

    xvi.   Mich. Comp. Laws § 400.610a;

    xvii.   Minn. Stat. §§ 15C.01, *et seq.*;

    xviii.   Mont. Code Ann. § 17-8-410;

    xix.   Nev. Rev. Stat. Ann. § 357.210;

    xx.   N.J.S.A. 2A:32C-7;

    xxi.   N.M. Stat. Ann. § 27-14-9;

    xxii.   N.Y. Fin. Law § 190.6;

    xxiii.   N.C. Gen. Stat. § 1-610;

    xxiv.   63 Okla. St. Ann. § 5053.4;

    xxv.   R.I. Gen. Laws 9-1.1-4;

    xxvi.  Tenn. Code Ann. § 71-5-183;

    xxvii.  Tex. Hum. Res. Code Ann. § 36.110;

    xxviii.  32 V.S.A. § 635;

    xxix.  Va. Code Ann. § 8.01-216.7;

    xxx.  Wash. Rev. Code Ann. § 74.66.070;

    xxxi.  D.C. Code Ann. § 2-308.15; and

I.    Relator be awarded all costs and expenses associated with each of the pendent State FCA and insurance fraud claims, plus attorney's fees as provided pursuant to:

    i.  Cal. Gov't Code § 12651(g)(8);

    ii.  Cal. Ins. Code § 1871.7;

    iii.  Colo. Stat. Ann. § 24-31-1203;

    iv.  Conn. Gen. Stat. §§ 4-278, 4-279;

    v.  6 Del. C. § 1205;

    vi.  Fla. Stat. Ann. § 68.086;

    vii.  Ga. Code. Ann. § 49-4-168.2(i);

    viii.  Haw. Rev. Stat. § 661-27;

    ix.  740 Ill. Comp. Stat. Ann. § 175/4(d);

    x.  740 Ill. Comp. Stat. Ann. § 92/25;

    xi.  Ind. Code § 5-11-5.7-6;

    xii.  Iowa Code § 685.3;

    xiii.  La. Rev. Stat. § 46:439.4;

    xiv.  Md. Code, Health-Gen. § 2-603;

    xv.  Mass. Gen. Laws Ch. 12 § 5F;

89

xvi.   Mich. Comp. Laws § 400.610a;

xvii.   Minn. Stat. § 15C.01, *et seq.*;

xviii.   Mont. Code Ann. § 17-8-410;

xix.   Nev. Rev. Stat. Ann. § 357.180;

xx.   N.J.S.A. 2A:32C-8;

xxi.   N.M. Stat. Ann. § 27-14-9;

xxii.   N.Y. Fin. Law § 190.7;

xxiii.   N.C. Gen. Stat. § 1-610;

xxiv.   63 Okla. St. Ann. § 5053.4;

xxv.   R.I. Gen. Laws § 9-1.1-4;

xxvi.   Tenn. Code Ann. § 71-5-183;

xxvii.   Tex. Hum. Res. Code Ann. § 36.110;

xxviii.   32 V.S.A. § 635;

xxix.   Va. Code Ann. § 8.01-216.7;

xxx.   Wash. Rev. Code Ann. § 74.66.070;

xxxi.   D.C. Code Ann. § 2-308.15; and

J.      Relator be awarded all back pay and associated damages, including all costs, expenses and attorney's fees, as provided pursuant to the California FCA's Anti-Retaliation provisions, Cal. Gov't Code § 12653.

K.      Defendant ceases and desists from further violations of the FCA, various state FCAs as set forth above, CIFPA, ICFPA, and NJMAHS;

L.      Defendant is excluded from future participation in Government Programs per the NJMAHS;

90

M.    Relator and State Plaintiffs be awarded  pre- and post-judgment interest on the awards ordered herein; and

N.    Relator and State Plaintiffs be awarded such further relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury as to all issues so triable.

Dated:  February 13, 2026

Respectfully submitted,

By: _____

Robert A. Magnanini
Kenneth S. Levine
STONE & MAGNANINI LLP
400 Connell Drive, Suite 6200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@smcomplex.com
klevine@smcomplex.com

*Attorneys for Plaintiff-Relator*

91

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any Court or any pending arbitration or administrative proceeding.

STONE & MAGNANINI LLP
*Attorneys for Relator*

Dated:  February 13, 2026

By: _____
Robert A. Magnanini

92